Plaintiff brought this action for specific performance of a contract for the sale of real estate and the performance by the purchaser of certain obligations to cancel mortgage liens upon the property of plaintiffs, and for damages caused by the nonperformance of the contract.
The complaint alleges that the real estate, subject of the contract, was a part of a development in or near the City of Burlington, and consisted of a house, workshop, and a number of lots in a subdivision referring to the map. It was sold at public auction and defendant became the highest bidder at the price of $14,775, causing his name to be signed to a "sales *Page 542 
ticket," or memorandum of the agreement, and the purchase was confirmed by the plaintiff.
Plaintiff then had a warranty deed to the property prepared somewhere about 4 June, 1946, and delivered it to defendant. The defendant accepted the deed, made a cash payment of $925. The defendant took possession of the property, collected the rents therefrom, made changes in the dwelling house, had the insurance transferred to him, and generally exercised dominion and ownership over the property.
It is further alleged that there were encumbrances on the property, which also covered other property of plaintiff, consisting of three deeds of trust, listed in the complaint, securing a total of $13,000 which defendant agreed to pay out of the purchase price and cancel of record. The complaint alleges that when plaintiff delivered the deed the defendant told him he had acquired all indebtedness secured by these mortgages.
The complaint sets up an itemized statement of a settlement alleged to have been made between plaintiff and defendant, in debit and credit form, which defendant tendered to plaintiff and plaintiff accepted.
The statement credits the purchase price of the property, $14,775, charging against it the three notes and deeds of trust mentioned, rent of house for one month after Hall took over, $420 rent of apartment for Lowe's mother, and two percent discount on purchase price for cash settlement, $30 rent of shop by Lowe, $40 legal fees to Hall, $925 cash payment, which, adjusted by some other small items, left due to Lowe $163, which was paid on the settlement.
It is alleged that Hall kept the deed until 22 July, 1946, when he mailed it to plaintiff, and plaintiff has been unable to redeliver the deed because of Hall's refusal to receive it. That Hall demanded a reduction of $2,500 in the purchase price. Hall has refused to cancel the deeds of trust as agreed. The plaintiff alleges that he has been damaged thereby in the sum of $5,000.
The defendant, in his answer, admits the purchase of the property at the auction at the purchase price named, the signing of the contract, the acceptance of the deed, the purported settlement leaving a balance due Lowe of $163, and that the encumbrances mentioned in the complaint were not canceled. He sets up as a defense that the sale was conditioned by the auctioneer upon the ability of Lowe to give a good title; that the title was not good, in that included in the property sold to him there was some to which Lowe had not title, and that there were upon the property laborers' and materialmen's liens in a substantial amount. He further alleges that the purchase of the property, the signing of the deed, the purported settlement, were all brought about through the false and fraudulent representation of the plaintiff that he had a clear and unencumbered title to the property conveyed, whereas, there was included in it *Page 543 
certain property known as the Scott Cates lot to which plaintiff had no title.
On the trial the plaintiff introduced the allegations of the complaint and admissions in the answer, and proceeded with testimony.
The plaintiff testified in support of the allegation in his complaint in the same tenor as above set out.
Plaintiff testified that after the sale was confirmed by him he had a deed prepared, signed by himself and wife, acknowledged before a notary, and, on 5 June, 1946, delivered it to Mr. Hall. They settled up for everything owed by either party to the other, leaving a balance due plaintiff of $163 which defendant paid him in cash, and out of which he paid defendant $150 for straightening up the title. That Hall knew the condition of the title to the land because he had paid him theretofore $300 to look it up.
Plaintiff paid Hall $150 to get a deed for a "little undeveloped piece of property" next to the house, the Scott Cates lot. Hall had the deed at the time with about 30 names on it — all but one of the heirs. He was to draw the papers so that Lowe might go to New Jersey to get the last heir to sign. This was six months before the sale. Plaintiff testified that he paid Hall $300 to look up the title — to protect himself — at the time of the loans, and Hall reported to him it was good.
Witness stated that he had had some work done on the apartment house, shop building and garage, all of which had not been paid for at the time of the delivery of the deed, but all had been paid for some time after the sale. One bill, Mr. Harris' bill, had not yet been paid. That material did not go into the house Cooper Hall bought, "but he put a lien on everything I had." No liens had been filed when the deed was delivered.
"I told Mr. Hall the Scott Cates property came to a point of one foot on Queen Street and spanned out to 25 feet to the back of the property he bought. It was not across the Cooper Hall lot, it was on one side. The Scott Cates line was the Hall line."
"Mr. Hall knew the location of the Scott Cates lot when he bought the property — all about it, when he lent the money on the property — he had the deed in his hand, looking and reading it off and looking at the piece of property."
Mr. Hall now has the deed from the heirs to the Scott Cates lot. Mr. Hall prepared the deed for him to take to New Jersey for the last heir to sign and reported the title was all right.
Geddie Fields, the auctioneer who sold the Lowe property, testified for plaintiff that the property sold to Hall consisted of an apartment house, woodworking shop and several lots. Prior to the sale he announced that the sale was subject to passing the title by "the most exacting attorney." There was other property of Lowe sold at the auction — in all over *Page 544 
$42,000. Some time in July, 1946, Mr. Lowe brought witness a deed Mr. Hall had sent back and said Hall had decided not to take the property, showing a letter to that effect. Witness loaned Lowe money, disbursing it in payment of bills for labor and material on Lowe's property — because Hall said he would not take the property because of outstanding bills. Fields carried the paid bills to Hall, along with the deed. The paid bills represented every dime as far as witness knew which might be against the property. He told Hall that Lowe was looking to him to deliver the deed and he was doing it now. Hall said he was not going to take the property unless Lowe knocked off $2,500. He raised no objection as to the title. At this time there were no liens filed against the property.
On the question of damages this witness testified that he was familiar with the real estate market in the area, and had an opinion satisfactory to himself as to the damage caused Lowe by the failure to cancel the mortgages and accept the title. It was placed at $15,000. It was explained that he was unable, because of the situation in which it left the remaining land sold at the auction, also included in the uncanceled deeds of trust, to deliver deeds to any of the purchasers. That a second sale always affects the price of property. He attempted such a sale — not including that purchased by Hall — and could get no bids.
Plaintiff introduced documents as exhibits, including the deed of himself and wife to Hall, the statement of settlement prepared by Hall, and the instruments securing indebtedness which it was alleged Hall promised to pay and cancel, showing them to be still outstanding. The deeds in trust covered the Hall purchases as well as additional property of plaintiff.
The defendant testified that after the purchase of the property he wrote to Mr. Phipps, Lowe's attorney, that he wanted the deed delivered 3 June as he would pay cash, and it would be necessary to cancel a mortgage on the remaining property before he left. Mr. Lowe came in the office on 7 June. He told Lowe that when he went over to cancel the bank mortgage a man told him he expected he'd "get messed up" about the title because the Cates property was included in what he bought. Lowe assured him it was not, and on the strength of that "we proceeded to settlement of our matters as indicated here on that slip which has been introduced." Defendant denied paying the $163 balance.
Defendant denied representing Lowe in the Scott Cates matter except to get "the minor's interest." He testified that Geddie Fields came to see him about the matter and he asked Fields, "Well, have you paid all of these labor and material claims?" And Fields told him he had, and wanted to show him the papers, and defendant said, "No, I am not interested any longer. I have been completely worn out trying to get a title, and I'm through with it." Defendant denied saying anything to Fields about knocking off $2,500 from the price. *Page 545 
Defendant said the deed containing the names of all the heirs to the Scott Cates property was received by him the latter part of June and is now in his office. It was not put on record because, "This man, Mr. Black, came into my office and told me about these lines and when he did, why, I stopped and folded my hands and called for Mr. Lowe." Defendant filed the lien for Harris and "filed it on everything Ben Lowe had out there," because it was impossible to work out a description.
Defendant testified that he had taken over the property when Lowe gave him the deed, and collected the rents. That he collected the rents, and credited them on the mortgages. They have not been actually credited on the papers but a record has been kept in his office. Defendant stated that he was in possession of the premises, not as owner, but under the mortgages.
Mrs. Hall corroborated defendant in saying that Mr. Hall said nothing to plaintiff in the conversation which she heard about reducing the purchase price by $2,500. She thinks she was present every time when a conversation of that sort could have occurred. Defendant introduced copy of the lien of Harris Lumber Company for materials furnished Lowe, on Lowe's property, including that purchased by Hall.
In rebuttal plaintiff introduced various deeds purporting to convey the Scott Cates property, as to all heirs.
The defendant demurred to the evidence in the manner directed by the statute and moved for judgment of nonsuit, which motion was denied, and defendant excepted.
The following issues were submitted and answered as indicated:
 "1. Was a warranty deed for the property, described in the complaint as bid off by the defendant, signed, sealed, acknowledged, and delivered by the plaintiff B.R. Lowe and his wife to the defendant as alleged in the complaint?
"Answer: Yes.
 "2. Was the delivery of the deed to the defendant procured by false and fraudulent representations of the plaintiff B.R. Lowe as alleged in the Answer?
"Answer: No.
 "3. What damages, if any, is the plaintiff B.R. Lowe entitled to recover of the defendant?
"Answer: $2,000.00.
 "4. What amount, if any, is the defendant entitled to recover of the plaintiff B.R. Lowe on his counterclaim?
"Answer: .........."
Defendant moved to set aside the verdict for errors committed on the trial, which motion was overruled, and defendant excepted. To the ensuing judgment defendant objected and excepted; and thereupon appealed, assigning errors. *Page 546 
Numerous objections were made to the instructions given by the court to the jury, all of which have been given careful attention. We do not find in them prejudicial error and do not feel that extended discussion is demanded. Reference to the theory on which the case was tried — and perhaps the only possible theory on which it could be tried under the pleadings — will clear up some of these objections.
The defendant's defense is practically one of confession and avoidance. He accepted plaintiff's deed and effected a settlement with him, went into possession of the property as owner, and collected rents — rents from Lowe himself and his mother, and assumed complete dominion. All this, he alleges, was done under the fraudulent representations of the plaintiff with respect to the title of the property, particularly with regard to the Scott Cates strip or wedge, which plaintiff represented as located outside the purchased property, whereas, the defendant contends, it is located within it. On this he asked for a rescission of the whole transaction and his money back. The plea and demand for rescission was inconsistent with assertion of a claim for breach of warranty, Troitino v. Goodman,225 N.C. 406, 415, 35 S.E.2d 277. Counsel stakes the issue on fraud.
The matter in the most favorable light for the defendant, was a jury question, and the jury declined to accept the imputation of fraud. Considering the admissions of the defendant as to his acquaintance with the Scott Cates situation, and his acceptance of fees on several occasions to investigate the title to the property, and the opportunity afforded him to re-examine it, it is a question whether his defense might not be as weak in law as the jury found it to be in fact.
However, the verdict on the quantum of damages cannot be sustained on the evidence and instructions in the record. There was error in the admission of the evidence of Fields giving his opinion of the amount of damages, since that was the province of the jury. The instructions based upon it were, therefore, affected with the same objection.
There must be a new trial on the issue as to damages; and to that end the case is remanded. In other respects we find no error, and the judgment is affirmed.
Partial new trial. *Page 547